**Daniel T. DAVIS, Appellant (Plaintiff),**

**v.**

**BIG HORN BASIN NEWSPAPERS, INC., a Wyoming Corporation; Sean McMahon; Lee Lockhart; and Michael Bloom, Appellees (Defendants).**

**No. 94-81.**

Supreme Court of Wyoming.

Nov. 18, 1994.

Daniel T. Davis, Worland, pro se.

Randy D. Kotel of Cook, Kotel & Fitch, Denver, CO, for appellees.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

GOLDEN, Chief Justice.

Appellant Daniel Davis filed suit for libel against appellees, Big Horn Basin Newspapers, Inc., and various individuals. The district court granted appellees' motion for summary judgment and denied Davis' motion for summary judgment. Davis appeals this order. We affirm. Davis also appeals denial of his motions for sanctions, which portion we dismiss for violations of the Wyoming Rules of Appellate Procedure.

Appellant's presented issues are:

1. In this case, could a jury find that the defendant acted with malice.

2. Do the facts of this case as, presented in Plaintiff's Motion for Summary Judgment, prove malice in the Defendant, Daily News, by clear and convincing evidence.

3. Is the Plaintiff entitled to Rule 11 sanctions where the Defendants stated in their Answer that Plaintiff's Complaint was frivolous and without merit and that all statements in the articles complained of were true or substantially true, knowing such statements to be false.

4. Is the Plaintiff entitled to a protective order under the Wyoming Rules of Civil Procedure, where, in a short deposition, Defendant's Attorney consulted three times with the deponent during the course of the deposition in a manner indicating that the subject of the deponent's testimony needed to be discussed; and he supplied the deponent answers at least 29 times during the deposition in his objections; and on two occasions he simply gave the answers to the deponent; and at least five times he directed the deponent not to

answer questions with no proper basis; and finally he repeatedly made baseless objections to obstruct and to disrupt.

Appellees' presented issues are:

I. Were the articles printed in the North Wyoming Daily News on March 17, 18, and 19 true or substantially true and published without malice and thus a complete defense to any claim of libel.

1. Once the Appellees alleged that there was no issue of material fact, the burden is on the Appellant to show that there was sufficient evidence, utilizing the clear and convincing standard, to rebut the Appellees' evidence.

2. The Appellees have proved that the articles as written were either true, substantially true, or published without malice and hence there is no libel as to this public figure Appellant.

3. The Appellant has failed to show, by clear and convincing evidence, that the Appellees subjectively knew that the articles as published were false or published the articles with reckless disregard for the truth.

II. Were the subsequent articles published by the North Wyoming Daily News concerning the filing of the complaint and answer in the immediate matter (Count IV of Plaintiff's amended complaint) privileged under W.S. § 1–29–105, which operates as a complete defense to any claim of libel.

III. Was the Plaintiff a "Public Figure" for all counts of the amended complaint.

IV. Whether the court erred in denying the plaintiff's motion for Rule 11 sanctions and for sanctions concerning appellees' attorney's behavior at a deposition.

V. Should the appellant's appeal be dismissed for failure to abide by the requirements of Rule 7.01 W.R.A.P.

## FACTS

Davis, a Worland attorney, organized the Wyoming Consumer Group and brought a petition with the Public Service Commission alleging that the gas utility, Wyoming Gas, was overpaying for its gas. In March of 1992, the Public Service Commission con-

ducted hearings and found that Wyoming Gas was paying the fair market value. THE NORTH WYOMING DAILY NEWS reported the hearings in daily consecutive articles during the three days of hearings. Statements from these three articles were the basis for Davis' action in March of 1993 alleging three counts of libel. The newspaper then published an article reporting that Davis had filed the lawsuit, and Davis amended his complaint alleging a fourth count of libel had occurred in this last article.

In Count I, Davis charged that four parts of the March 18, 1992 article, "PSC gas rate hearing under way; no rebate forthcoming," were defamatory:

1. In that Petition, Dan Davis, attorney and founder of the Wyoming Consumer Group, asked the PSC to rule on a rebate of $9,304,400 from Wyoming Gas Company.

Nicholas asked the Commissioners to dismiss the second amended Petition with prejudice because the Petition was presented to (Wyoming Gas) only two weeks ago and because it covered issues already in (sic) been ruled on by the PSC.

PSC Chairman John Smyth, after conferring with the other Commissioners, ruled he would dismiss the Petition, but that he would not do so with prejudice.

According to Doug Moench, PSC attorney with the Consumer Representative Staff, although the decision prevents any kind of a rebate to come from the hearings, the Consumer Group can refile a petition at a later date if more evidence is found (emphasis added).

2. Smyth told Davis several times, as he was questioning witnesses, to ask some leading questions, so that they could get on with the hearings.

3. While Davis was questioning Phil Caines, a comptroller for Wyoming Gas, Smyth warned Davis that he had cut his (Caines) testimony off three different times, and that (Smyth) was not going to stand for it.

4. Tim Good, vice president and general manager of the Cody Gas Company was called by Davis as a witness, to testify

what the Cody Gas Company paid per mcf (1000 cubic feet) of natural gas.

After 45 minutes of testimony regarding what the gas company paid, Smyth, with obvious exasperation, told Davis to go on to the next line of questioning.

Davis charged that the quotes were false and the meaning generated by the overall tone of the article had a defamatory meaning. In the second count, Davis charged three statements from the March 19, 1992 article, *"PSC chairman nixes Davis' motion that he disqualify himself. Davis alleges gas hearing chairman is 'mean,'"* were defamatory:

1. When Ketchum was asked by Moench if his company could sell natural gas to Wyoming Gas Company, he replied that "No, I could not because all of InterEnergy's gas is under contract."

2. During Wednesday's testimony, Worland resident Harry Moberly, who was called as a witness by Davis, testified he had some knowledge of the gas business because he had been financially linked to six different gas wells.

Contrary to what Davis was trying to establish, Moberly testified that he would rather have a 20 year fixed rate contract than a 30 day spot rate contract.

3. Davis called NGP Vice President Janeen Capshaw as a witness to help establish the fair market price of natural gas.

Davis questioned Capshaw for more than 45 minutes, with Capshaw continually asking Davis to clarify what he meant by several questions. Capshaw, after the questions were repeated or reworded by either Davis or the PSC staff, testified that NGP sells the remaining 80 percent of NGP produced natural gas—the amount of gas not being sold to Wyoming Gas—for $2.11 an mcf (just for the gas), compared to the $2.08 it sells the gas for to Wyoming Gas. She said that at that price, NGP is able to sell all of the natural gas the company can produce.

Davis contended that these quotes were false and it was false that he called Capshaw as a witness. He further charged that the entire article conveyed a false and defamatory meaning.

Davis' third count charged six statements from the March 20, 1992 article, *"PSC hearings on gas prices convene, will reopen in Cheyenne. PSC chairman: 'Most frustrating' experience,"* were defamatory:

1. After Davis' motion had been denied, Davis continued his examination of witnesses to try and prove that Wyoming Gas had not tried to find other, cheaper sources of natural gas to sell its customers.

Davis also called witnesses to the stand to support his belief that gas producers would rather sign a short term contract at generally lower spot prices than a 20-year contract at a fixed rate.

Testimony was also received from two contradictory Davis-called witnesses. One testified that InterEnergy, Inc. does not have any natural gas available to sell to Wyoming Gas Company, because all of InterEnergy's gas is under contract.

The other Davis called witness, Harry Moberly, said he would rather sign a 20 year contract at a fixed rate than a 30 day contract at a spot rate, because it would give him a guaranteed rate of return.

2. Because of the slow pace of the hearings and the plodding questioning by Davis, Smyth said the Worland hearing was the "most frustrating" experience he has ever had in his 15 years on the PSC board.

3. Davis called Capshaw to the witness stand again and continued questioning her about the amount of natural gas that NGP has dedicated to Wyoming Gas.

After more that 30 minutes of Davis questioning Capshaw about dedicated gas, Smyth stopped Davis and told him, "The question has been answered to the satisfaction of everyone, Mr. Davis, so please proceed to your next question."

4. During Wednesday and Thursday's cross examination of Chapshaw (sic) Davis was admonished by Smyth more than 12 times to stop referring to Mrs. (sic) Chapshaw (sic) as Mrs., but to call her Miss Capshaw and to stop using acronyms when referring to the different areas of natural gas purchasing.

5. After two hours of testimony from Capshaw, Davis dismissed her as a witness, saying he wanted to call another witness who could testify that Chapshaw (sic) had lied while under oath.

Smyth stopped the proceedings and told Davis that Chapshaw (sic) should be allowed to finish her testimony before Davis called a witness to try and prove perjury.

6. At one point during the hearings, Smyth said, "We're in disarray again," and he granted a short recess so Davis could enter some of his paperwork as evidence with the Court Recorder.

Davis charged that the quotes and facts of the article were false and that the entire article conveyed several different false and defamatory meanings. He alleged the article falsely represented that Davis incompetently presented a frivolous case, held him up to contempt and ridicule, and injured his reputation as a lawyer. In the fourth count, Davis charged the March 10, 1993 article, "*Allegations denied in Daily News defamation lawsuit,*" contained two false statements:

"[T]he complaint by plaintiff Dan Davis is 'frivolous and totally without merit.' ..."

" 'All statements and/or writings authored by these defendants were true or substantially true when made,' the response said."

Count five of Davis' complaint charged that the defendants had acted maliciously and with wanton disregard of the rights of Plaintiff.

Both parties filed motions for summary judgment. Although the appellate briefs state that the trial court heard argument on those motions and then entered an order on the motions, neither the transcript of that hearing nor the court's order are included in the record.

This court's resolution of appellant's numerous libel charges and his challenges of the trial court's decisions regarding his motions for sanctions are hampered by the seriously deficient briefing presented to this court. The record in this case is over one thousand pages, yet neither party provides references to the record in their statement of facts as required by Wyo.R.App.P. 7.01(e)(2).

Appellant's argument cited neither pertinent authority nor made cogent argument. Appellant also incorporated by reference trial briefs contained in the record rather than the parts of the record relied on as directed by Wyo.R.App.P. 7.01(f). *See Scherling v. Kilgore,* 599 P.2d 1352 (Wyo.1979) (noting that this method does not comply with the rules), and appellant did not include any of the court's final orders in his brief as required by Wyo.R.App.P. 7.01(j).

The record does not contain copies of the court's final order on the cross motions for summary judgment or transcripts of proceedings below. Although appellant does not provide the standard of review in his brief, our standard of reviewing a district court's denial of motions for Wyo.R.Civ.P. 11 sanctions is whether the court abused its discretion. *LC v. TL,* 870 P.2d 374, 381 (Wyo. 1994); *Wardell v. McMillan,* 844 P.2d 1052, 1067 (Wyo.1992). Without the necessary record, it is impossible for this court to determine whether an abuse of discretion has occurred. Appellant's argument lists many facts without references to the record. He baldly states the conclusions of the district court are in error but provides no authority or argument. Appellant's appeal of the denial of sanctions is therefore dismissed and we address only the appeal of the summary judgment order.

## DISCUSSION

Appellant charges these articles are libelous because they ridiculed him and injured his reputation as an attorney. "A defamatory communication is one which tends to hold the plaintiff up to hatred, contempt, ridicule or scorn or which causes him to be shunned or avoided; one that tends to injure his reputation as to diminish the esteem, respect, goodwill or confidence in which he is held." *Tschirgi v. Lander Wyoming State Journal,* 706 P.2d 1116, 1119 (Wyo.1985).

We begin examining this appeal by identifying the proper standard of review. Appellant's complaint states that he is a public figure. While a "private figure" who has been libeled may recover by proving the defendant was "negligent," a libeled public

984

figure invokes the actual malice standard for liability. *Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 912 (Wyo.1992). A public figure who has been libeled by the publication of a false statement of fact on a matter of public concern will not prevail in proving defamation under the actual malice standard unless he proves with convincing clarity that the statement was made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not. *Dworkin*, 839 P.2d at 912.

In applying the actual malice/convincing clarity standard in the summary judgment context, this court follows the same approach it uses in any other summary judgment setting: we have the same task as the trial court, we have the same material as that court, and we follow the same standards. *Dworkin*, 839 P.2d at 914. We view the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts. *Tschirgi*, 706 P.2d at 1117. Proof that the statement is substantially true is all that is generally required to defend against a charge of defamation. *Dworkin*, 839 P.2d at 917; *Tschirgi*, 706 P.2d at 1120.

Appellant contends that the reporter/author "listened to the truth, then twisted, falsified and omitted material facts in order to convey meanings which were incredibly damaging." Appellant asserts that his argument focuses solely upon malice to show that

he provided the district court with clear, convincing evidence of malice precluding summary judgment. The sum total of appellant's evidence of malice is simply to state the offending statement and then supply the "conveyed" meaning derived from that statement. For example, appellant claims that the statement in the fourth paragraph of the first article, *"The Consumer Group can re-file a Petition at a later date if more evidence is found,"* falsely conveys the meaning that he was not prepared and therefore his reputation as a lawyer was injured. From the articles, appellant derives these other conveyed defamatory meanings: *"key witness flops," "incompetent questioner," "he invents perjury," "he causes disarray."*

This kind of argument is little more than appellant's subjective interpretation of the articles and not clear and convincing evidence of malice. Appellant does prove that the statement that he called Miss Capshaw as a witness was inaccurate; however, inaccuracy without malice is not actionable. Because appellant does not raise any genuine questions of material fact, the district court's order is affirmed.